715 F.2d 410
 36 UCC Rep.Serv. 1200
 Fred H. MARTELLA, Robert M. Berry, Robert M. Lee and William
J. Mouren, d/b/a Arkavalley Farm, a partnership, Appellees,
v.
James H. WOODS, Jr., Appellant.
Fred H. MARTELLA, Robert M. Berry, Robert M. Lee and William
J. Mouren, d/b/a Arkavalley Farm, a partnership, Appellants,
v.
James H. WOODS, Jr., Appellee.
 Nos. 82-2257, 82-2258.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 16, 1983.
Decided Aug. 24, 1983.
 
 Lamar E. Ottsen, Jr., Moline, Tegethoff, Ottsen, Mauze & Leggat, St. Louis, Mo., for Woods.
 Stan J. Goodkin, Popkin, Stern, Heifetz, Lurie, Sheehan, Reby & Chervitz, St. Louis, Mo., for Martella, etc.
 Before BRIGHT, JOHN R. GIBSON, and FAGG, Circuit Judges.
 BRIGHT, Circuit Judge.
 
 
 1
 James H. Woods, Jr., d/b/a Chaumiere Farms, appeals the judgment of the district court[1] awarding Fred H. Martella, Robert M. Berry, Robert M. Lee and William J. Mouren, d/b/a Arkavalley Farm $43,248 in damages for cover and $64,529.60 in damages for the nondelivery of certain heifers. Arkavalley Farm cross-appeals, arguing that the district court erred in failing to award $129,391.50 in damages for lost profits. For the reasons outlined below, we affirm on the merits, but reverse and remand to the district court for recomputation of damages.
 
 
 2
 I. Background.
 
 
 3
 On or about December 2, 1976, Woods and Ralston Purina Company, d/b/a Arkavalley Farm, executed the "Arkavalley Farm Heifer Growing Contract." The contract provided that Woods would purchase from Arkavalley Farm an unspecified number of three and four month-old heifers. Woods would feed these heifers and allow them to breed with bulls furnished by Arkavalley. The contract also provided that when these heifers reached approximately 24 to 30 months of age Woods would sell them back to the Arkavalley Farm at a price determined by the weight of each heifer. The then-pregnant heifers would be used to replace the less productive heifers in Arkavalley's dairy farm.[2]
 
 
 4
 Pursuant to this contract, Woods purchased 190 Holstein heifer calves from Arkavalley. Woods expected that the calves would reach 900 pounds between 18 and 19 months of age. At that time, the parties expected to place the heifers with a bull. Waiting until the calves reached 900 pounds before breeding them would benefit both parties because Woods could produce heavier bred heifers thereby obtaining the maximum contract price of 48 cents per pound and Arkavalley would receive replacement heifers capable of producing more milk than could smaller heifers.
 
 
 5
 Problems arose, however, because the heifers did not grow fast enough. None of the first 36 heifers ultimately placed with bulls reached 900 pounds between 18 and 19 months of age. Indeed, 34 of the 36 heifers did not reach 900 pounds until they were 22 months or older.
 
 
 6
 Between March 26 and May 8, 1979, Woods sold 41 bred heifers to Arkavalley. These heifers averaged slightly more than 30 months of age.
 
 
 7
 In April of 1979, Ralston Purina sold Arkavalley Farm to Martella, Berry, Lee and Mouren, and assigned them its interest in the 1976 contract.
 
 
 8
 On May 5, 1979, Woods informed Arkavalley that, because the heifers were not progressing normally and were causing the Chaumiere Farm to lose money, he was going to sell the heifers. Arkavalley offered Woods 46 cents per pound for the 144 heifers.[3] Woods rejected this offer. Woods then proceeded to sell the remaining 144 heifers, which were supposed to have been sold to the dairy, to third persons.
 
 
 9
 To compensate for the heifers that Woods failed to supply, Arkavalley purchased 50 pregnant heifers from third parties. Arkavalley then sued Woods in federal district court for breach of contract. Arkavalley contended that Woods breached the contract by failing to resell 144 of the 186 heifers to Arkavalley Farm. Woods failed to dispute that his sale of the 144 heifers to third parties did not conform to the requirements of the contract. Rather, Woods argued in the district court that the contract was rescinded by failure of consideration. Woods asserted that no consideration for the contract existed because Arkavalley breached expressed and implied warranties concerning the quality of the heifers provided to him.
 
 
 10
 The district court found that: (1) the assignment of the contract from Ralston Purina to Martella, Berry, Lee and Mouren was effective because it did not materially change the duties, burdens or risks of Woods; (2) Arkavalley made no express warranties as to the quality of the heifers Woods purchased; (3) there existed no implied warranties as to the calves because it is impossible to determine the growth and breeding potential of heifer calves at three or four months of age, when they were purchased by Woods; (4) the fact that the heifers had grown slowly and thus were incapable of being dairy replacement heifers at 24 to 30 months of age was not a condition precedent to Woods' performance of the contract, making the contract unenforceable; and finally, (5) the contract was not, therefore, rescinded because of failure of consideration.
 
 
 11
 On the issue of damages, the district court: (1) awarded Arkavalley $43,248 in damages for cover; (2) awarded Arkavalley $64,529.60 in damages for nondelivery; and (3) determined that Arkavalley was not entitled to damages for lost profits.
 
 
 12
 On appeal, Woods urges that the district court erred in: (1) concluding that no express or implied warranties of the quality of the heifer calves existed; (2) concluding that growth of the heifers and their development into dairy replacement heifers within the time frame specified in the contract was not a condition precedent; (3) concluding that the conduct of the parties did not demonstrate mutual recision of the contract; and (4) awarding damages. In its cross-appeal, Arkavalley asserts that the district court erred in finding that Arkavalley was not entitled to recover lost profits.
 
 
 13
 II. Discussion.
 
 
 14
 A. The Merits.
 
 
 15
 After a careful review of the briefs and record in this case, we conclude that the district court did not err in any of its rulings on the merits. However, the district court's award of damages presents more substantial questions, and it is to those issues we now turn.
 
 
 16
 B. Damages for Cover.
 
 
 17
 The district court found that Arkavalley had partially covered Woods' breach by purchasing 50 heifers at $63,088. The court observed that the contract price for the 50 heifers would have been $19,840. The district court concluded that the difference, $43,248, was recoverable as cover costs by Arkavalley. The court rejected Woods' argument that the 50 replacement heifers purchased by Arkavalley were not like-kind substitutes for the heifers Woods had sold to third parties. The court stated that "[i]t is irrelevant what the state of the heifers was when defendant Woods sold them to third parties." We disagree.
 
 
 18
 The Uniform Commercial Code, as adopted in Missouri, provides:
 
 
 19
 400.2-712 "Cover"--buyer's procurement of substitute goods
 
 
 20
 (1) After a breach within section 400.2-711 the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
 
 
 21
 (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (section 400.2-715), but less expenses saved in consequence of the seller's breach.
 
 
 22
 (3) Failure of the buyer to effect cover within this section does not bar him from any other remedy. [Mo.Ann.Stat. § 400.2-712 (Vernon 1965).]
 
 
 23
 Section 400.2-712 allows a buyer the right to purchase reasonable substitutes and recover the difference between the cost to obtain the substitute goods and the contract price. To recover under this section, the buyer must act in good faith and in a reasonable manner in purchasing substitute goods, and the goods must be a like-kind substitute. However, the buyer may not utilize cover to put himself in a better position than he would have been had the contract been performed. Boten v. Brecklein, 452 S.W.2d 86, 93 (Mo.1970).
 
 
 24
 We note initially that the contract did not require Woods to deliver pregnant heifers of a certain weight and quality to Arkavalley. The contract merely required Woods to sell and Arkavalley to buy those heifers between 24-30 months of age.[4] Therefore, a breach of that contract only permits Arkavalley to cover with the quality and size of heifers Woods was obligated to sell Arkavalley. The 50 heifers purchased by Arkavalley were not like-kind substitutes for the heifers Woods sold to third parties. The district court found that Arkavalley covered by purchasing 50 pregnant heifers, weighing between 1,100 and 1,200 pounds each. In contrast, the evidence establishes that, at best, only a third of the 144 heifers Woods sold to third parties could have been pregnant. The district court found, for example, that only 84 of the 190 heifers Woods possessed had been bred with Arkavalley bulls. Moreover, according to the district court's findings, the average weight of the 50 heifers Arkavalley purchased as cover was 1,100 to 1,200 pounds, which was substantially higher than Woods' 144 heifers. As the district court found, only 110 of Woods' 144 heifers weighed 900 pounds or more.
 
 
 25
 Arkavalley was only entitled to cover what Woods had to sell. By purchasing heifers seven and a half to eight months pregnant, weighing 1,100 to 1,200 pounds, Arkavalley placed themselves in a better position than they would have been had Woods resold his heifers to them. Arkavalley's cover was not a reasonable like-kind substitute for Woods' heifers. Accordingly, we determine that the district court erred in awarding cover damages.
 
 
 26
 C. Damages for Nondelivery.
 
 
 27
 The district court also awarded Arkavalley $64,529.60 in damages for Woods' failure to deliver 94 of the 144 heifers. This award represented the difference between the fair market price, at the time of the breach, of 89 pregnant heifers and 5 non-pregnant heifers, and the contract price. After a careful review of the record and briefs in this case, we conclude that the district court erred in awarding nondelivery damages.
 
 
 28
 Missouri law provides for damages for nondelivery:
 
 
 29
 400.2-713 Buyer's damages for nondelivery or repudiation
 
 
 30
 (1) Subject to the provisions of this article with respect to proof of market price (section 400.2-723), the measure of damages for nondelivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this article (section 400.2-715), but less expenses saved in consequence of the seller's breach.
 
 
 31
 (2) Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival. [Mo.Ann.Stat. § 400.2-713 (Vernon 1965).]
 
 
 32
 The contract merely required Woods to sell and Arkavalley to buy those heifers between 24-30 months of age. Therefore, a breach of that contract only permits recovery of the difference between the lower contract price and the higher market price of those heifers Woods was obligated but did not sell to Arkavalley. As we noted earlier, the evidence establishes that only a third of the 144 heifers Woods sold to third parties could have possibly been pregnant, and only 110 of Woods' 144 heifers weighed 900 pounds or more. Accordingly, we remand to the district court for a recomputation of damages based on the difference between the contract price and the market price for those heifers Woods had previously sold to third parties as of the time Arkavalley learned of the breach.
 
 
 33
 D. Lost Profits.
 
 
 34
 After a careful review of the record and briefs in this case, we determine that the district court did not err in refusing to award damages for lost profits.
 
 
 35
 III. Conclusion.
 
 
 36
 We affirm the district court's decision on the merits and refusal to award damages for lost profits. However, we conclude that the district court erred in calculating damages for cover and nondelivery. We determine that Arkavalley is entitled to damages only for the difference between the fair market price of the 144 heifers Woods sold to third parties and the lesser contract price, said differential to be determined as of the time that Arkavalley learned of the breach.
 
 
 37
 We observe that there exists some evidence in the record regarding the fair market price of the 144 heifers Woods sold to third parties. The district court, however, did not engage in any substantial factfinding on this issue. Accordingly, on remand, the district court may, at its discretion, hold a new hearing for additional factfinding before proceeding to recalculate damages.
 
 
 38
 Affirmed in part, reversed in part, and remanded to the district court for proceedings consistent with this opinion.
 
 
 
 [1]
 The case was tried before a United States Magistrate by consent of the parties pursuant to 28 U.S.C. § 636(c)(3)
 
 
 [2]
 Specifically, the contract provided in pertinent part:
 
 
 [1]
 Feeder [Woods] will purchase from Dairy [Arkavalley Farm] a mutually agreeable number of replacement heifers weighing approximately 200 pounds * * *
 * * *
 
 
 [3]
 Feeder will transport these replacement heifers to his farm * * * where Feeder will care for and raise them, allow them to breed with the bull(s) furnished by Dairy * * *
 
 
 [4]
 When these heifers reach approximately 24-30 months of age, Feeder will sell these heifers back to the Dairy using the following formula:
 
 
 [1]
 Those heifers weighing less than 1,100 pounds at forty (40) cents per pound
 
 
 [2]
 Those heifers weighing over 1,100 pounds but less than 1,200 pounds at forty-four (44) cents per pound
 
 
 [3]
 Those heifers weighing over 1,200 pounds at forty-eight (48) cents per pound
 
 
 [3]
 As we noted earlier in the text, Woods purchased 190 heifer calves from Arkavalley. One calf died and three others were viewed as unfit and sold on the open market. Between March 26 and May 8, 1979, Woods sold 41 bred heifers to Arkavalley. Woods also resold to Arkavalley a single "freemartin," which is a heifer incapable of reproduction. Thus, by mid-May 1979, Woods still had 144 of the original 190 heifers purchased from Arkavalley
 
 
 [4]
 We note that specifically the contract did not require Woods to deliver to Arkavalley pregnant heifers. The contract provided that "Feeder will transport these replacement heifers to his farm * * * where Feeder will care for and raise them, allow them to breed with the bull(s) furnished by the Dairy * * *." Thus, the plain language of the contract imposes upon Arkavalley the responsibility for breeding the heifers, and merely requires Woods to permit breeding. Indeed, Charles N. Brock, who had been the director of operations at Arkavalley Farms from 1969 to 1979, stated during direct examination:
 Q What was your understanding with respect to these one hundred and forty-four heifers, if some of them were not bred?
 [Brock] Under the terms of the contract, we always took the heifers back, whether they were bred or not.
 Q If they were not bred, what did Arkavalley do with them, if anything?
 [Brock] We would breed them.
 Arkavalley does not argue on appeal that Woods thwarted or in any way hampered Arkavalley's attempt to impregnate the heifers.