[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15131
_____

D. C. Docket No. 3:06-cv-00270-MCR-EMT

GULF POWER COMPANY,

Plaintiff-Appellee Cross-Appellant,

versus

COALSALES II, LLC,
f.k.a. Peabody Coalsales Company,

Defendant-Appellant Cross-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(June 26, 2013)

Before HULL, WILSON, and ANDERSON, Circuit Judges.

PER CURIAM:

This appeal arises from a contract dispute between Gulf Power Company, a Florida electric utility, and Coalsales II ("Coalsales"), a Missouri-based coal supplier and Delaware limited liability company. Coalsales appeals the district court's grant of summary judgment in favor of Gulf Power finding Coalsales liable for breaching its obligation to annually supply Gulf Power with 1,900,000 tons of coal. Coalsales also raises several challenges related to damages, which were awarded after a bench trial and motion for reconsideration. Gulf Power cross-appeals the district court's determination that it was entitled to damages for only one year of the multiyear contract. Having studied the parties' briefs and the relevant parts of the record, and having had the benefit of oral argument, we conclude that the district court's judgments should be affirmed.

## I.    Background

Because the relevant facts were thoroughly set forth in the district court's various orders, we need not repeat them all here, but merely summarize those facts. See Docs. 112, 171, 194, 198. On May 12, 1994, Gulf Power and Peabody Coalsales Company (Coalsales' predecessor) entered into the Coal Supply Agreement ("CSA") that is the subject of this dispute. Doc. 112 at 2. Per Sections 1.01 and 6.02 of the CSA, Coalsales agreed to provide Gulf Power with 1,900,000 tons of coal meeting certain sourcing and quality requirements annually through December 31, 2007. Doc. 54-3 (CSA, Sections 1.01 and 6.02).

2

The CSA designated three preapproved sources—the Paso Diablo Mine in Venezuela (Source A), the Galatia Mine in Illinois (Source B), and the Wells/Harris Complex in West Virginia (Source C)—and provided for other sources to be approved by Gulf Power.  CSA, Sections 2.30, 6.04-6.05.  Per section 7.02, it was "anticipated that the primary source of coal" would be a blend of Sources A and B.  The CSA was amended in 1998 and 2003 to stipulate that the "Primary Source of Deliveries" would be the Galatia Mine (i.e., Source B).[1]  Doc. 79-2 at 7; Doc. 79-3 at 13.  It is undisputed that over the course of the contract, Coalsales delivered coal from nine approved sources of coal.  Doc. 112 at 2 n.3.

The CSA specified several quality requirements.  Central to this litigation is the requirement that the sulfur dioxide content of the coal not exceed 1.7 pounds per MMBtu.[2]  If the weighted average sulfur dioxide content of the coal shipped in a calendar year were to exceed this level, Coalsales was to compensate Gulf Power with sulfur dioxide allowances.[3]  CSA, Section 7.01.

---

[1]    The 1998 and 2003 amendments left those portions of the CSA that were not "amended or superseded … unchanged and in full force and effect."  Doc. 79-2 at 8, Doc. 79-3 at 15.

[2]    As the district court explained, "'Btu' is an abbreviation for 'British thermal unit,' which refers to the amount of heat required to raise the temperature of one pound of water by one degree Fahrenheit, equivalent to approximately 1055 joules.  'Btu' is used in the power industry to describe the heat value of coal."  Doc. 171 at 3 n.4.  "MMBtu" represents one thousand Btus. Id. at 4 n.8.

[3]    As the district court explained:
Coal contains sulfur.  When coal is burned, the sulfur combines with oxygen, producing sulfur dioxide ("SO2").  State environmental agencies issue permits to utility companies

In 2003 Coalsales notified Gulf Power that adverse geologic conditions at the Galatia Mine constituted nonpermanent force majeure events that prevented it from meeting its tonnage requirements. Doc. 112 at 3-4. On January 23, 2006, Coalsales notified Gulf Power that the Galatia Mine had closed and the force majeure event had become permanent. Id. at 4. As a result, Gulf Power experienced a total shortfall of 3,775,995 tons of coal over the term of the CSA. Doc. 171 at 8 n.21.

Gulf Power filed suit in the Northern District of Florida for breach of contract on June 22, 2006, and both parties sought summary judgment on the issue of liability. The district court rejected Coalsales' argument that, once the Galatia Mine closed, the CSA's force majeure provision absolved it of having to provide coal from other approved sources, and granted Gulf Power's motion for partial summary judgment on liability. However, following a bench trial on damages, the district court held that Gulf Power's lower-sulfur, higher-cost cover purchases of

---

that limit the amount of SO2 they may emit at their generating plants. Utility companies receive a certain number of sulfur emissions allowances each year based on their allowed emissions. A utility company must have an emissions allowance for each ton of SO2 emitted. There is a market on which sulfur allowances are traded at variable – and, at least at times, very significant – prices.

　　If a utility company anticipates that it is going to emit more SO2 in a year than permitted under its allowable emissions, it must acquire additional allowances. Conversely, if a utility company anticipates that it will emit less SO2 in a year than allowed, it may either bank its allowances or sell them. In the alternative, a utility company may have pollution-control equipment that eliminates the need for additional sulfur allowances by reducing the amount of sulfur emissions. Lower sulfur coal is advantageous because it results in fewer sulfur emissions when burned. Sulfur content is thus a huge factor in the purchase and pricing of coal in this country.

Doc. 171 at 6 n.14.

4

coal were not reasonable and, therefore, Gulf Power was not entitled to any damages.

Gulf Power filed a motion for reconsideration,[4] arguing, <u>inter alia</u>, that, at a minimum, its cover purchases for the year 2007—which consisted of two types of coal that, when blended, had the same sulfur content as coal provided by Coalsales—were reasonable. Doc. 177 at 6-8. The district court found it had made a manifest error of fact by misunderstanding the quantity of high-sulfur coal Gulf Power had purchased that year, granted Gulf Power's motion, held an evidentiary hearing on damages for the year 2007, and awarded Gulf Power $20,527,789 in damages. Doc. 194, Doc. 198.

The district court's damages order and judgment did not include prejudgment interest. <u>Id.</u>; Doc. 199. Gulf Power contacted the district court's clerk's office to inquire about the omission, and the district court issued an October 4, 2011, order finding that Gulf Power was entitled to prejudgment interest. Doc. 200. On October 12, 2011, Gulf Power submitted to the court a Notice of Submission of Interest Calculation. Doc. 205. On October 18, 2011, Coalsales challenged the district court's order on substantive and procedural grounds. Doc. 206. The district court deemed the latter challenge "well-founded on procedural

---

[4]    Gulf Power's motion was to alter or amend the judgment or alternatively a motion for relief from judgment under Federal Rules of Civil Procedure 59(e) and 60(b). We refer to it simply as "a motion for reconsideration."

5

grounds" and allowed Gulf Power to submit a motion to alter, amend, and/or correct the court's judgment within fourteen days. Doc. 227 at 2. Gulf Power filed the motion within the stipulated deadline, but Coalsales objected that the filing date was beyond the deadline required by Federal Rule of Procedure 59(e), which requires that motions to alter or amend be filed within twenty-eight days from judgment. Doc. 238, Doc. 239. The district court acknowledged that Gulf Power's motion to alter or amend was untimely but then invoked its power under Federal Rule of Civil Procedure 60(a), which permits the sua sponte correction of clerical errors and omissions, to amend its judgment to include $6,896,183.85 in prejudgment interest. Doc. 246 at 2-4.

## II.    Liability

We review a district court's rulings on cross-motions for summary judgment de novo. Chavez v. Mercantil Commercebank, N.A., 701 F.3d 896, 899 (11th Cir. 2012). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Florida substantive law, including the Uniform Commercial Code ("UCC") as adopted in Florida, governs this dispute. CSA, Section 26.01. Under Florida law, "[t]he interpretation of a contract is generally a question of law for the court. However, where the wording of an agreement is ambiguous, its interpretation

involves questions of fact, precluding summary disposition." Barone v. Rogers, 930 So. 2d 761, 764 (Fla. 4th Dist. Ct. App. 2006) (citations omitted); accord Commercial Capital Res., LLC, v. Giovannetti, 955 So. 2d 1151, 1153 (Fla. 3d Dist. Ct. App. 2007).

Ambiguity is a question of law to be determined by the court, Am. Sav. & Loan Ass'n of Fla. v. Pembroke Lakes Reg'l Ctr. Assoc. Ltd., 908 F.2d 885, 888 (11th Cir. 1990) (citing intermediate Florida appellate court cases), and is reviewed de novo, Frulla v. CRA Holdings, Inc., 543 F.3d 1247, 1252 (11th Cir. 2008). "A contract is ambiguous when it is reasonably or fairly susceptible to different constructions." Friedman v. Va. Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952).

The crux of the parties' liability dispute turns on whether Coalsales was obligated to provide coal from other approved sources once the "primary source," the Galatia Mine, closed. Coalsales maintains that the CSA obligated it to provide coal from only the Galatia Mine and, once that mine closed, the CSA's force majeure provision (Section 14.02) alleviated Coalsales of any obligation to supply coal from other sources. Under Coalsales' reading, it had "substitution rights," whereby it could meet its 1,900,000 ton obligation by providing coal from other approved sources but it was not obligated to do so. Gulf Power argues that Coalsales erroneously characterized the CSA as a sole-source agreement.

7

According to Gulf Power, once the Galatia Mine closed, Coalsales was obligated to meet its tonnage requirements by supplying coal from other approved sources.

The district court correctly held that the CSA, both originally and as amended, unambiguously obligated Coalsales to provide 1,900,000 tons of coal from any approved source and that the closure of the "primary source" mine did not constitute a force majeure event that relieved Coalsales of this obligation. Doc. 112 at 13-14. Coalsales' argument that no provision of the CSA obligated it to provide coal once the Galatia Mine closed is wholly without merit. Section 6.02 of the CSA creates a simple mandatory obligation that Coalsales supply and Gulf Power buy 1,900,000 tons of coal annually. Section 6.02 provides in relevant part: "Seller shall supply to Buyer and Buyer shall purchase from Seller … 1,900,000 Tons of coal per Year during each Year of this Coal Supply Agreement." CSA, Section 6.02. While the CSA's force majeure provision, section 14.02, excused Coalsales of its obligation to supply coal from the "primary source" Galatia Mine, it did not excuse Coalsales from its obligation to provide 1,900,000 tons of coal.

As noted by the district court, "primary" simply does not mean "sole," and the CSA, both originally and as amended, clearly contemplated the supply of coal from other approved sources.[5] Indeed, Coalsales never disputed the fact indicated

---

[5]    See, e.g., CSA, Sections 6.04 and 6.05 (designating approved sources) and Section 7.01 (setting forth minimum Ash and Btu rejection limits for coal "[i]f during the term of this Agreement, [Coalsales] is required to supply coal from a Source other than A, B and/or C").

8

by the course of performance evidence—i.e., that Coalsales provided coal from eight other approved sources from 1994 until Coalsales declared a permanent force majeure in 2006.[6]  See Doc 112 at 2 n.3, Doc. 54-2 at 3.  Rather, Coalsales argues that this course of performance evidence supports its competing interpretation that Coalsales had a "right but not an obligation" to provide coal from other sources.[7]  In other words, Coalsales argues, that it had a right to substitute coal from other sources, but not an obligation to do so.

---

[6]    Coalsales faults the district court for relying on this piece of undisputed extrinsic evidence while ignoring or rejecting its own proffered extrinsic evidence.  Coalsales initially argued to this Court that Florida courts cannot consider extrinsic evidence in interpreting unambiguous contracts, though it simultaneously maintained that its own extrinsic evidence entitled it to summary judgment.  Coalsales later modified its position in its reply brief, arguing that "at a minimum" a court could not, as it argues the district court did, rely on extrinsic evidence in a manner that alters the contract's terms.

Under the Florida UCC, courts may consider extrinsic evidence of course of performance, course of dealing, or usage of trade to explain or supplement a contract's terms, even when those terms are not ambiguous, as long as the evidence is not used to contradict the contract's terms.  Fla. Stat. §§ 672.202, 672.202 cmt. 1(c), 672.208.  The district court's reliance on extrinsic evidence was minimal and proper.  It noted simply that Coalsales' provision to Gulf Power of coal from eight sources other than the "primary source" was at odds with Coalsales' position that the CSA was a sole-source agreement.  Doc. 112 at 12.  The district court also did not improperly reject or ignore Coalsales' proffered extrinsic evidence.  The district court explained that most of the evidence Coalsales cited was improper extrinsic and parol evidence consisting of "depositions, declarations and letter records of contemporaneous negotiations."  Id. at 7 n.20.

[7]    See CSA, Section 6.04 ("Seller shall have the right to supply the coal to be delivered hereunder from the Paso Diablo Mine, (Source A), State of Zulia, Venezuela; the Galatia Mine, (Source B), Saline County, State of Illinois; or other Source(s) approved by Buyer, which approval shall not be unreasonably withheld.") and Section 6.05 ("Seller shall have the right to supply the coal to be delivered hereunder from the following 'Other Source(s)' which are preapproved by Buyer; provided, however, Source(s) B and C shall be subject to satisfactory test burns…: B.  Galatia Mine, Illinois[,] C. Wells/Harris Complex, West Virginia[.]").

9

Coalsales is correct that the term "right" does not indicate that there is an obligation. Nor, however, does it indicate the contrary. Here, the obligation to provide coal from other sources after the closure of the Galatia Mine derives not from the term "right" in the sourcing provisions but from the clear language of section 6.02 requiring Coalsales to supply 1,900,000 tons of coal. Coalsales' "right but not obligation" argument fails.

Also without merit is Coalsales' argument that it is unreasonable to assume that it would enter into this type of contract. It is entirely reasonable for a big supplier of coal, like Coalsales, to enter into a contract like this, a contract that contemplates using a particular mine as a primary source but does not provide in the force majeure clause an escape from the obligation to supply the stated volume in the event the primary mine is eliminated by force majeure. In order to enter into such a contract, a supplier like Coalsales would simply have to do what would be reasonable in the circumstances, namely, survey the market for coal and conclude that it was feasible to supply coal at the stated price from the primary mine or from one or more alternative mines should the primary mine close. We would expect a prudent supplier—especially one with the sophistication of Coalsales—to conduct such a survey.

Finally, Coalsales argues in the alternative that the district court should have denied both parties' motions for summary judgment and held a trial to consider

10

"economics and the non-feasibility" of providing coal from other sources.[8]

Coalsales hinges its argument on language in the force majeure provision, section 14.02, which it says requires only reasonable mitigation efforts on its part. In other words, Coalsales maintains that a trial on the fact question of reasonability would have shown that mitigating the force majeure by providing coal from other approved sources was not economically reasonable or feasible. This argument is clearly foreclosed by section 14.03, which provides that "economic conditions which may adversely affect the anticipated profitability" of mining operations would not be taken into consideration in excusing performance under the force majeure provision.

For the foregoing reasons, we reject Coalsales' challenge to the district court's summary judgment decision holding that Coalsales was liable for breach of its contractual obligation to supply 1,900,000 tons of coal to Gulf Power.

## III.    Damages

Gulf Power cross-appeals the district court's holding, after a bench trial, that it was not entitled to damages because its cover purchases were unreasonable and its subsequent holding, after a motion for reconsideration, that it was entitled to

---

[8]    Coalsales, citing precedent from the Third Circuit, also argues that a trial should have been held because its interpretation of the contract was a reasonable one and, therefore, the contract was ambiguous. See In re Color Tile Inc., 475 F.3d 508, 515-16 (3d Cir. 2007) ("Given two conflicting but reasonable interpretations, a contract will be viewed as ambiguous at [the] early stage" of summary judgment.). Our conclusion that the contract unambiguously obligated Coalsales to provide 1,900,000 tons of coal from any approved source precludes this argument.

11

damages only for the year 2007.  Coalsales challenges the district court's grant of

Gulf Power's motion for reconsideration and the district court's sua sponte

reopening of evidence, the district court's award of damages for the year 2007, and

the admission of testimony by Gulf Power's fuel manager, H. Russell Ball.

Finally, Coalsales challenges the district court's award of prejudgment interest.

We discuss each challenge in turn.

### A.  Gulf Power's Cross-Appeal

A district court's determinations with regard to the legal standards governing

damages are reviewed de novo, but factual findings are reviewed for clear error.

A.A. Profiles, Inc. v. City of Fort Lauderdale, 253 F.3d 576, 581 (11th Cir. 2001).

The reasonableness of a buyer's cover is a finding of fact and, as such, is reviewed

for clear error.  See Transammonia Export Corp. v. Conserv, Inc., 554 F.2d 719,

724 (5th Cir. 1977) (explaining, in a case addressing the Florida UCC cover

provision, that "whether a plaintiff has made his cover purchases in a reasonable

manner poses a classic jury issue") (internal quotation marks omitted).[9]  Under the

clear error standard, "we may reverse the district court's findings of fact if, after

viewing all the evidence, we are 'left with the definite and firm conviction that a

mistake has been committed.'"  HGI Assocs., Inc. v. Wetmore Printing Co., 427

---

[9]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

F.3d 867, 873 (11th Cir. 2005) (citing United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 542 (1948)).

Gulf Power sought damages under the Florida UCC's cover provision, Fla. Stat. § 672.712, which provides:

> (1) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.
> (2) The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (s. 672.715), but less expenses saved in consequence of the seller's breach.
> (3) Failure of the buyer to effect cover within this section does not bar her or him from any other remedy.

Fla. Stat. § 672.712.  Gulf Power did not plead, in the alternative, a claim for damages under the Florida UCC market remedy provision, Fla. Stat. § 672.713, which calculates damages as "the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (s. 672.715), but less expenses saved in consequence of the seller's breach."  Fla. Stat. § 672.713(1).

The district court found that Gulf Power's purchases of lower-sulfur, higher cost coal to replace the coal that Coalsales failed to deliver were not "like kind" to the coal called for under the CSA and were, therefore, not reasonable cover.  Doc. 171 at 29-31.  In support of its finding, the district court cited Martella v. Woods, in which the Eighth Circuit held that a dairy farmer's purchase of pregnant,

13

substantially heavier heifers as cover when a cattle feeder breached its obligation to sell him substantially lighter heifers, only a third of which could have been pregnant, was an unreasonable substitute under the Missouri UCC's cover provision because the cover cows were not "like-kind substitutes" and the dairy farmer had placed himself in a better position than he would have been in had the cattle feeder performed. Martella v. Woods, 715 F.2d 410, 413 (8th Cir. 1983). The Eighth Circuit reversed and remanded for a proper calculation of damages based on the difference between the market price of the heifers the cattle feeder was obligated to sell to the dairy farmer at the time he learned of breach and the contract price. Id. at 414. The district court also cited a similar analysis in Kanzmeier v. McCoppin, 398 N.W.2d 826, 833 (Iowa 1987). As the district court noted, in both Martella and Kanzmeier, remand to the district court for a calculation of damages based on the UCC market remedy provision was appropriate because evidence of market price already existed in the record. See Doc. 171 at 30 nn. 59-60.

In extensive and detailed findings of fact, the district court explained that Gulf Power's cover approach was part of a calculated strategy shift whereby Gulf Power sought lower-sulfur import coal in order to minimize its reliance on sulfur allowances in the run-up to the implementation of a federal rule that would significantly reduce the availability of sulfur allowances; by the time the rule

14

became effective, Gulf Power intended to have new technology installed at one of its plants that would eliminate its need to purchase additional sulfur allowances. Doc. 171 at 22-29.

The district court rejected Gulf Power's argument that the purchases were reasonable because the market dictated the purchase of the low-sulfur, higher-cost imported coal. Gulf Power pointed to its requests for proposals (RFPs) that solicited bids for the substitute coal, which specified sulfur content above the CSA's sulfur content cap. These, Gulf Power claimed, showed that it was willing to accept coal with a sulfur content above the cap imposed by the CSA but that instead the market responded with bids below the CSA cap. However, the district court explained that "although the sulfur content set forth in the RFPs was in excess of that provided for in the CSA, Gulf Power actually sought and purchased substitute coal with a sulfur content considerably lower than that provided for in the CSA and at a higher price per ton than other available alternatives." Doc.171 at 22. Indeed, at least one potential bidder who inquired whether Gulf Power would consider domestic coal—which has a higher sulfur content—was told the bid would be awarded to import coal only. Doc. 169 at 209-12. Given the evidence cited by the district court, and our own review of the record, we cannot

say that we are "left with the definite and firm conviction that a mistake has been committed." There was no clear error in the district court's reasonability finding.[10]

Gulf Power argues in the alternative that the district court should have quantified the benefit Gulf Power received by purchasing the lower-sulfur coal as "expenses saved" and deducted those savings from its cover damages. As Gulf Power itself acknowledged at oral argument, the benefit derived from lower-sulfur coal is not the kind of "expenses saved" contemplated in the cover remedy formula of § 672.712. Rather, "expenses saved" more likely refers to the difference in transportation costs, or other such expenses from which the buyer might be saved because of the different details provided for in the cover contract, as contrasted with the original contract with the defaulting party. This makes sense. If a product purchased as "cover" is not a "like kind" product, then its price is obviously not an appropriate measure of the damages actually suffered. Rather, the appropriate measure of damages would be the market remedy provided for in § 672.713, in which damages are calculated by comparing the contract price to the fair market value of comparable goods on the open market. Put another way, it is not

---

[10] Gulf Power's argument that its purchases were reasonable because the bulk of the substitute coal came from an approved source that had been previously supplied by Coalsales is also without merit. Coalsales supplied only small quantities of the substitute coal. It is simply not reasonable to expect Coalsales to supply the entire 1,900,000 tons from a low-sulfur, high-price coal.

16

appropriate to try to back into an equivalent amount by calculating the benefit to the buyer of covering with superior goods.[11]

Given the facts of this case, the appropriate remedy to Coalsales' breach was the market remedy of § 672.713.  Gulf Power did not plead this remedy in the alternative, and even if it had, there was no evidence of market price in the record from which the district court could calculate damages under the market remedy itself.[12]

### B. Coalsales' Challenges to the District Court's Damages Rulings

Coalsales challenges the district court's grant of Gulf Power's motion for reconsideration and its sua sponte reopening of evidence, after which the district court awarded Gulf Power $20,527,789 in damages for the year 2007.

A motion for reconsideration, whether filed under Federal Rule of Civil Procedure 59(e) or 60(b), is reviewed for an abuse of discretion.  Sanderlin v. Seminole Tribe of Fla., 243 F.3d 1282, 1285 (11th Cir. 2001); Farris v. United States, 333 F.3d 1211, 1216 (11th Cir. 2003).  "A [district] judge has broad discretion to reopen a case to accept additional evidence, and his decision will not

---

[11]    Because we find this alternative theory inapplicable, it is unnecessary for this Court to address the parties' arguments regarding which party bore the burden of proving expenses saved.

[12]    Gulf Power does not argue on appeal that it is entitled to the market remedy as an alternative, and indeed concedes that such remedy is not available to it.  We need not address whether the statute requires an election.

17

be overturned absent an abuse of that discretion." Hibiscus Assoc. Ltd. v. Bd. of Trs., 50 F.3d 908, 917-18 (11th Cir. 1995) (citation omitted).

The district court granted Gulf Power's motion for reconsideration because it mistakenly understood that Gulf Power had purchased only 150,000 tons of high-sulfur coal in 2007.  In fact, and as shown by the record, Gulf Power had purchased 1,200,000 tons of the high-sulfur coal, which it blended with 1,125,000 tons of low-sulfur coal to produce a blend of coal with a "sulfur content identical to that called for under the CSA."  Doc. 194 at 6.  Thus, Gulf Power's cover purchases for the year 2007 were reasonable "like kind" substitutes.

In light of the fact that the district court correctly acknowledged that its previous decision denying all damages had suffered from a "manifest error of fact" with respect to Gulf Power's purchases of cover coal for the year 2007, and because the relevant evidence was already in the trial record, we cannot conclude that the district court abused its wide discretion in granting the motion for reconsideration by Gulf Power.

We also conclude that the district court did not abuse its wide discretion in reopening the evidence, especially in light of the fact that the district court's primary consideration in reopening the record appears to have been to permit the parties to adduce evidence with respect to "expenses saved," i.e., evidence which would serve to reduce Gulf Power's damages.

18

Coalsales also challenges the district court's award of damages for the year 2007 based on insufficient evidence of a dock charge credited to Gulf Power and Gulf Power's payment of sulfur premiums under the cover contracts, which were related to its argument that it saved no expenses. The district court's order on 2007 damages clearly explains why evidence regarding both of these matters was sufficient. This argument is without merit. Doc. 198 at 5, 7-8.

Finally, Coalsales' challenge to the district court's admission of the testimony of H. Russell Ball, Gulf Power's fuel manager, is wholly without merit. His testimony falls comfortably within the well-established category of admissible testimony by business owners and officers based on their personal but particularized knowledge acquired by virtue of the routine activities and functions of their employment. See Fed. R. Evid. 701, Advisory Comm. Note (2000). Also, there was no abuse of discretion in the district court's finding that Gulf Power's disclosures with regard to Ball were adequate.

### C. Coalsales' Challenge to the Award of Prejudgment Interest

Coalsales argues that the district court erred in sua sponte amending its original damages judgment to award Gulf Power $6,896,183.85 in prejudgment interest. According to Coalsales, because the award was a substantive amendment, it could only be initiated via a timely filed Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment and could not be achieved via the court's

invocation of the power granted by Federal Rule of Civil Procedure 60(a) to "correct a clerical mistake or a mistake arising from oversight or omission."[13]

A district court's decision to enter a corrected judgment under Rule 60(a) is reviewed for an abuse of discretion. Rivera v. PNS Stores, Inc., 647 F.3d 188, 193 (5th Cir. 2011), cert. denied, 132 S. Ct. 1741 (2012). "But the determination of whether it is Rule 60(a) that authorizes the correction—as opposed to Rule 59(e) or Rule 60(b)—is a question of law that we review de novo." Id.

We need not decide whether the district court erred in correcting the omission of prejudgment interest as a clerical error under Rule 60(a).[14] We may affirm on any ground supported by the record. Welding Servs., Inc. v. Forman, 509 F.3d 1351, 1356 (11th Cir. 2007) (citing Bircoll v. Miami-Dade Cnty., 480

---

[13]    While a Rule 59(e) motion "must be filed no later than 28 days after the entry of judgment," Rule 60(a) is more flexible:

> The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, such a mistake may be corrected only with the appellate court's leave.

Fed. R. Civ. P. 59(e), 60(a).

[14]    Coalsales argues that because Florida law permits a party to challenge the award of prejudgment interest on equitable grounds, the award of prejudgment interest is discretionary, not mandatory, and, therefore, cannot be corrected as a mere clerical omission. See Broward Cnty. v. Finlayson, 555 So. 2d 1211, 1213 (Fla. 1990) (explaining that the award of prejudgment interest "is not absolute and may depend on equitable considerations"). This Court indicated the possible relevance of this distinction in Osterneck v. E.T. Brawick Indus., Inc., 825 F.2d 1521, 1526 n.8 (11th Cir. 1987) (Osterneck I), aff'd, Osterneck v. Ernst & Whinney, 489 U.S. 169, 109 S. Ct. 987 (1989) (Osterneck II). We note, however, that the U.S. Supreme Court, in well-reasoned dicta, explained that all motions for prejudgment interest should be regarded as requests for substantive amendments to a judgment, regardless of whether the award was mandatory or discretionary. Osterneck II, 489 U.S. at 176 n.3, 109 S. Ct. at 992 n.3.

20

F.3d 1072, 1088 n.21 (11th Cir. 2007)).  We construe Gulf Power's Notice of Submission of Interest Calculation as a timely Rule 59(e) motion to alter or amend the judgment.[15]  Gulf Power's notice was filed well within the Rule 59(e) twenty-eight-day timeline and requested a substantive change in the judgment.  Indeed, the notice specifically requested that the district court "issue an amended judgment" to include prejudgment interest.  Doc. 205 at 4.  Furthermore, the notice met the requirements for a motion under Federal Rule of Civil Procedure 7(b).  Under Rule 7(b), a motion must "(A) be in writing unless made during a hearing or trial; (B) state with particularity the grounds for seeking the order; and (C) state the relief sought."  Fed. R. Civ. P. Rule 7(b).  Gulf Power's notice was in writing, cited the authority under which it was entitled to prejudgment interest and explained its methodology for calculating the sum, and clearly identified the relief it sought (prejudgment interest).  Coalsales' challenge to the district court's award of prejudgment interest thus fails.[16]

---

[15]    See Yost v. Stout, 607 F.3d 1239, 1243 (10th Cir. 2010) ("In determining whether a motion is brought under Rule 59, we look beyond the form of the motion to the substance of the relief requested.  Where the motion requests a substantive change in the district court's judgment or otherwise questions its substantive correctness, the motion is a Rule 59 motion, regardless of its label.") (citations and internal quotation marks omitted); Munden v. Ultra-Alaska Assoc., 849 F.2d 383, 386 (9th Cir. 1988) ("In determining whether a post-judgment motion is one brought under Rule 59(e), nomenclature is not controlling.  Rather, this court looks at the substance of the requested relief to see if it is relief which might have been granted under Fed. R. Civ. P. 59(e).") (citations and internal quotation marks omitted).

[16]    Coalsales does not otherwise challenge Gulf Power's entitlement to prejudgment interest or the amount thereof.

21

The district court's judgments are AFFIRMED.[17]

---

[17]    Other challenges to the judgments of the district court are rejected without need for further discussion.